# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

BNJ LEASING, INC., and
MRB ENTERPRISE, INC.,

     Plaintiffs,

v.

PORTABULL FUEL SERVICE, LLC,

     Defendant.

Case No. 2:19-cv-00156-KS-MTP

**DEFENDANT PORTABULL FUEL SERVICE, LLC'S MEMORANDUM IN SUPPORT
OF ITS MOTIONS FOR SUMMARY JUDGMENT AND *DAUBERT* MOTIONS**

Pursuant to Local Rule 7 and F.R.C.P. 56, Defendant Portabull Fuel Service LLC ("Portabull") submits these five motions, which are ripe for consideration by this Court.

## I.     INTRODUCTION

Since the filing of this case, it has been clear that Plaintiffs' patented "invention" is different than Portabull's Taurus and Minitaur fuel tanks ("Accused Products").[1]  Portabull has thus been clear in its communications with the Plaintiffs that the Accused Products do not infringe the sole claim of U.S. Patent No. 10,232,782 ("the '782 Patent").  This single claim relates to a mobile refueling vessel that is effectively a temporary gas-station at a construction site used to fuel heavy equipment.  *See generally* Exhibit A, the '782 Patent; *see also* Statement of Uncontested Facts ("SoF") at ¶¶1-3.  This Court construed the sole claim of the '782 Patent in the claim construction order of March 23, 2021.  Dkt. No. 135; *see also* SoF at ¶6.

A patent, a government issued right to exclude, can be granted to those who invent a new and useful machine. 35 U.S.C. § 101.  However, in the event someone else arrived at the invention first or the invention is based on existing products and is simply an obvious change to the existing industry knowledge, the inventor is not entitled to a patent.  *See* 35 U.S.C. §§ 102 and 103 respectively.  A late-arriving inventor is therefore precluded from obtaining a patent.  As set forth below, there are certain actions, namely the circumstances surrounding the filing of the patent as well as Portabull's own commercial activities that are ripe for summary judgment.

Additionally, patent infringement, as a strict liability tort, requires an identical mapping of the construed claim to the accused products, and in the event any single element is missing,

---

[1]     For the purposes of this motion, there are no meaningful distinctions between the Taurus, a 20,000 gallon tank, and the Minitaur, a 16,000 gallon tank.

infringement cannot be found.  There is no dispute regarding the operation of the Accused Products or the meaning of the claims; summary judgment of non-infringement is ripe.

There are certain un-deniable facts that are set forth in the accompanying Statement of Uncontested Facts that are incorporated herein and even taken in a light most favorable to the Plaintiffs this case is ripe for resolution at summary judgment.  *See* SoF at ¶¶1-23.  Portabull submits two case-dispositive motions: one regarding the non-infringement of the Accused Products and one regarding the unenforceability of the '782 Patent based on the sole named inventor breaching, to Portabull's detriment, a non-compete agreement he entered into when selling a nearly identical predecessor company.  Each independently will resolve this case.

Portabull also submits herewith three *Daubert*-type motions:  1) one seeking to exclude Plaintiffs' damages experts opinions as they relate to lost profits; 2) one seeking to strike Plaintiffs' undisclosed Doctrine of Equivalents theory that Plaintiffs' technical expert presents; and 3) one seeking to exclude Plaintiffs' technical expert's opinions as they relate to validity for being based on an improper understanding of the law.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex v. Catrett,* 477 U.S. 317, 322 (1986).  Where the movant bears the burden of proof on an issue, the movant must present evidence for each required element of the dispositive issue.  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991).  The burden then shifts to the non-movant to raise a genuine issue of material fact in order to defeat the motion.  *Id*.  However, if the non-movant bears the burden, the movant is entitled to summary judgment by

demonstrating that the non-movant failed to proffer sufficient evidence to make a prima facie case. *See Celotex*, 477 U.S. at 323.

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine [dispute] of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Disputes over irrelevant or unnecessary facts will not defeat a summary judgment motion; rather, the dispute must include a material fact and be genuine "such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In ruling on a motion for summary judgment, all facts and evidence must be viewed in the light most favorable to the non-movant. *Id*. at 255.

### 1. Patent Infringement

Determining whether a product literally infringes a patent is a two-step process. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1319 (Fed. Cir. 2012). The Court must first determine the proper construction of the asserted claims as a matter of law. *Id*. Second, the finder of fact must determine whether the asserted claim, as construed, "reads" on the product or method. *Id*. Thus, "a patentee must supply sufficient evidence to prove that the accused product or process contains . . . every limitation of the properly construed claim." *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1328 (Fed. Cir. 2019) (quoting *Seal-Flex, Inc. v. Athletic Track and Court Const.*, 172 F.3d 836, 842 (Fed. Cir. 1999)).

Literal infringement of a means-plus-function[2] claim limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical

---

[2]    Means-plus-function claiming is often referred to as 112(f) under the current version of 35 U.S.C. § 112 AIA, or 112, paragraph 6 in the pre-AIA version of 35 U.S.C. § 112. The change

or equivalent to the corresponding structure in the specification. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320 (Fed.Cir.2003). Once the relevant structure in the accused device has been identified, a party may prove it is equivalent to the disclosed structure by showing that the two perform the identical function in substantially the same way, with substantially the same result. *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed.Cir.2000). The word "equivalent" in section 112 invokes the familiar concept of an insubstantial change which adds nothing of significance. *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed. Cir. 1993).

The "insubstantial difference" analysis requires a determination of "whether the 'way' the accused structure performs the claimed function, and the 'result' of that performance, are substantially different from the 'way' the claimed function is performed by the 'corresponding structure ... described in the specification,' or its 'result.'" *Ishida Co. v. Taylor*, 221 F.3d 1310, 1317 (Fed. Cir. 2000). When the "way" is not substantially the same, there can be no infringement under the "equivalents" portion of 112(f). *See Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1365 (Fed. Cir. 2000) (describing the differences in the way the accused product and described invention sealed an envelope and affirming district court's finding of summary judgment of non-infringement). In other words, when the accused product achieves the same function "in a substantially different manner than do the structures in the" patent, the product cannot infringe. *Ishida Co. v. Taylor*, 221 F.3d 1310, 1317 (Fed. Cir. 2000).

## 2. Infringement Contentions

in the law did not affect the substantive analysis of means-plus-function, only the numbering of the paragraphs.

The Federal Circuit applies its law "to both substantive and procedural issues intimately involved in the substance of enforcement of the patent right." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed.Cir.2004) (internal quotation marks omitted). Because procedural patent processes "are essentially a series of case management orders," a district court "may impose any 'just' sanction for the failure to obey" them, including "refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence." *Phigenix, Inc. v. Genentech, Inc.*, 783 F. App'x 1014, 1016 (Fed. Cir. 2019).

Experts who provide opinions after the close of fact discovery that are not rooted in contentions disclosed during fact discovery may have their opinions excluded. *Id.* at 1017. Infringement contentions serve a notice function to a patent defendant by "allow[ing] the defendant to pin down the plaintiff's theories of liability . . . thus confining discovery and trial preparation to information that is pertinent to the theories of the case." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947); CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2001 (2d ed. 1994); Fed. R. Civ. P. 33, advisory committee's note to 1970 amendment of subsection (b)). Failure to timely disclose infringement theories, as an activity that severely hinders the party defending against the allegations of patent infringement, warrants striking of those theories. *Phigenix*, 783 F. App'x at 1020.

### 3. Unclean Hands

The Supreme Court has articulated the governing legal standard for the equitable doctrine of unclean hands. In *Keystone Driller Co. v. General Excavator Co.*, the Court explained that a determination of unclean hands may be reached when "misconduct" of a party seeking relief "has

immediate and necessary relation to the equity that he seeks in respect of the matter in litigation," i.e., "for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court." 290 U.S. 240, 245 (1933). In *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co*., the Court stated that the doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant," and requires that claimants "have acted fairly and without fraud or deceit as to the controversy in issue." 324 U.S. 806, 814–15 (1945). The Court added that the doctrine "necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant." *Id.* at 815.

In the patent infringement context, a finding of unclean hands may result in an equitable finding of unenforceability of an asserted patent, as well as a granting of attorney fees. *Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231, 1248 (Fed. Cir. 2018) (citing *Keystone*, 290 U.S. at 246–47; *Precision Instrument*, 324 U.S. at 819). The court must determine whether the violation of the party having unclean hands "affect[s] the equitable relations between the parties in respect of something brought before the court for adjudication." *Keystone Driller*, 290 U.S. at 245. It is up to the Court's discretion to apply this equitable doctrine to protect the public from the unclean litigant. *Gilead*, 888 F. 3d at 1239.

### 4. Prior Art

In 2013, the law regarding what constitutes prior art changed. *Compare* 35 U.S.C. 102 pre-AIA ("A person shall be entitled to a patent unless … the invention was patented or described in a printed publication in this or a foreign country or **in public use or <u>on sale in this country</u>, more than one year prior to the date of the application** for patent in the United States") *with*

35 U.S.C. 102 AIA ("A person shall be entitled to a patent unless—the claimed invention was patented, described in a printed publication, or **in public use, <u>on sale, or otherwise available to the public</u>** before the effective filing date of the claimed invention").

Prior art products can be prior art if they are "on sale" or if they are "otherwise available to the public," a catchall provision to allow for subject matter that may not cleanly fall into the prior statutory scheme to still constitute prior art. *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 139 S. Ct. 628, 634 (2019) ("'otherwise available to the public' captures material that does not fit neatly into the statute's enumerated categories but is nevertheless meant to be covered."). The scope of what constitutes prior art unquestionably was broadened with the passage of the AIA. *Id.* at 633 (the AIA "added the catchall phrase 'or otherwise available to the public'").

### a)  "On-sale"

A device is "on sale" if it is both the subject of a commercial offer for sale and ready for patenting, which can be established by "drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at 633. An offer for sale that is confidential is still an offer for sale, even if the parties are contractually obligated to keep the existence of the transaction a secret. *Id.* An actual sale does not actually need to occur for a product to be "on-sale," as long as an offer for sale is made. *Id.*; *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001). "[A] commercial offer for sale [under § 102(b) is] one which the other party could make into a binding contract by simple acceptance (assuming consideration)". *Id.*

### b)  "Or otherwise available to the public"

As noted above, the statutory scheme of the AIA is broader than the pre-AIA version of the patent statute. *Helsinn*, 139 S. Ct. at 633. To Portabull's knowledge, there has not yet been a

binding determination of this "catch all" provision as far as what must occur to be "otherwise available to the public." But the Supreme Court has noted that it was added to the AIA, providing an additional category of prior art that did not exist before. *Id.*

*BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 965 (Fed. Cir. 2020), which involved a pre-AIA patent, and pre-AIA version of the patent statute, describes some of the policy reasons associated with the still-present concept of "in public use." In particular, the Court there noted that "[w]hen no efforts are made to conceal a process or design, it is available to the public." 955 F.3d at 966. What this means is that the "or otherwise available" language must *add* something beyond the "in public use" language concept that was part of the statute pre-AIA. In particular, the *BASF* court's opinion, which was made after the passage of the AIA, suggests there need not be an advertisement of a product to make it available, as long as no active efforts were undertaken to conceal a design. *Id.*

**B.** *Daubert*

Pursuant Rule 702 of the Federal Rules of Evidence, courts are to serve as a gatekeeper to ensure that expert testimony is appropriate and helpful—i.e., reliable. *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 597 (1993). And it is the proponent of expert evidence that "must prove, by a preponderance of the evidence, that the evidence is reliable." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir. 2020). To satisfy this burden, an expert's testimony must rest "on a reliable foundation and [be] relevant to the task at hand." *Daubert*, 506 U.S. at 597; *see also Moore v. Ashland Chems. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc) (5th Cir. banc 1998)). "Evidentiary reliability, or trustworthiness, is demonstrated by a showing that the knowledge offered is "'more than speculative belief or unsupported speculation,'" and the knowledge asserted "must be based on 'good grounds.'" *U.S. v. Posado*, 57 F.3d 428, 433 (5th

Cir. 1995) (citing *Daubert*, 509 U.S. at 589-90); (quoting *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc) "Expert evidence that is not reliable at each and every step is not admissible." *Jacked Up, L.L.C.*, 807 F. App'x at 348 (citing *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (internal punctuation omitted)).

### 1.    Economic Experts – Lost Profits

Following the precedent in the *Panduit* case, as Plaintiffs here do, the patentee must prove four elements: (1) demand for the patented product; (2) an absence of acceptable, non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit that would have been made. *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir.1978). If the Patentee is able to "establish[] a reasonable probability of 'but for' causation, 'the burden shifts to the accused infringer to show that [the patent owner's 'but for' causation claim] is unreasonable for some or all of the lost sales.'" *Grain Processing Corp. v. Am. Maize-Prods Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999) (quoting *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc)).

Damages under Panduit are not easy to prove. *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017); *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1349-53 (Fed. Cir. 1999) (patentee **could not** obtain damages under *Panduit* because a product that was not even sold on the market was considered an acceptable non-infringing alternative). Indeed, the second factor of *Panduit*, absence of acceptable non-infringing alternatives, "often proves the most difficult obstacle for patent holders. Under this factor, if there is a noninfringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale." *Mentor Graphics*, 851 F.3d at 1286.

## 2.    Patent Experts – "Fit"

Expert opinions and testimony based on incorrect statements of law should be excluded as unreliable. *See Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts, not only unproven science, but incorrect law. **Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories**.") (emphasis added).

In the patent context, the legal test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; rather, the test is what the combined teachings of those references would have suggested to those of ordinary skill in the art. *Facebook, Inc. v. Windy City Innovations, LLC*, 973 F.3d 1321, 1343 (Fed. Cir. 2020) (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)); *see also In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983) ("[I]t is not necessary that the inventions of the references be physically combinable to render obvious the invention under review."); *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc) ("Etter's assertions that Azure cannot be incorporated in Ambrosio are basically irrelevant, the criterion being not whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole."). When a technical expert's testimony regarding validity is premised on an improper understanding of the law, it is appropriate to exclude such testimony in order to avoid jury confusion on the issue. *See e.g.*, *Innovention Toys, LLC v. MGA Ent., Inc.*, No. CV 07-6510, 2012 WL 12990384, at *4 (E.D. La. Oct. 17, 2012) (prohibiting an expert from testifying regarding incorrect legal requirements); *Accord Bausch & Lomb, Inc. v. Alcon Labs., Inc.*, 79 F. Supp. 2d 252, 257-58 (W.D.N.Y. 2000) (excluding expert testimony about "what is required for a patent to be valid . . . . including matters relating to prior art, obviousness, enablement, and the 'best mode'

requirement" because it was "calculated to invade the province of the court to determine the applicable law and to instruct the jury as to that law"); *Clintec Nutrition Co. v. Baxa Corp.*, No. 43 C 7050, 1998 WL 560284 *9 (N.D.Ill. Aug. 26, 1998) (same).

## III.   ARGUMENT

### A.    The Accused Products Do Not Include The Claimed Deck Access Device

The Court issued its claim construction order in this case on March 23, 2021. Dkt. No. 135; *see also* SoF at ¶6. In doing so, the Court determined that the claimed "deck access device" is limited to "the structure depicted as numerals 92a and 92b in Figures 4-5, and as described in the specification at 3:46-66." *Id.* at 11; *see also* SoF at ¶7. There is no dispute as to how the construed "deck access device" operates or how it permits a user to access the horizontal deck 94 in the context of the '782 Patent. *See* SoF at ¶¶10-12. Ladder 92 has two sections, 92a and 92b, that are pivotally connected together. Exhibit A, '782 Patent, column 3, line 51-52. Ladder section 92a folds upwardly upon ladder section 92b. *Id.* at column 3, line 65-66. When using the "deck access device," a user folds down ladder 92a and, in a single-directional motion, walk up the ladder 92 to get to the horizontal deck 94. Under the Court's construction, as a matter of law, the sole claim of the '782 Patent is thus limited to this subject matter and "equivalents thereof." 35 U.S.C. § 112(f).

As noted above, covered equivalents must be so insignificantly different that they perform the same function in **substantially the same way** to achieve **substantially the same result**. *Kemco*, 208 F.3d at 1364. When the way the accused product archives the result of the claimed device is different than how the patent achieves the result, there can be no infringement. *Id.* at 1365.

Dr. Klopp, Plaintiffs' infringement expert, concedes that he does not offer an opinion that Portabull's accused devices literally match the "deck access device" depicted in Figures 4 and 5, and the accompanying disclosure. Exhibit D, Klopp Deposition, 116:15-19 (Q: "Is it your opinion that the Portabull fuel center is the same as what is depicted in Figures 4 and 5?" A: "No."). This

is unsurprising upon even a cursory review of Figures 4 and 5 of the '782 Patent and Portabull's products:



Figure 2: Annotated Figures 4 and 5 from the '782 Patent showing the deck access device (92a and 92b, red) connected to the horizontal deck 94 (blue). Pivoting from this deck is the tiltable platform 96 (green). Also shown in black is the refueling boom being accessed by a worker standing on the tiltable platform.



Exhibit E, Dr. Klopp's Opening Report at ¶34, depicting annotated '782 Patent, Figs. 4 and 5; *see also* ¶57 depicting the Accused Products (red tanks above); *see also* SoF at ¶¶8-9. There is no dispute as to the structure or operation of the device depicted in the '782 Patent or the Accused Products. *See* SoF at ¶¶8-9.



*Id*. at ¶88 (a more detailed depiction of the ladder staircase arrangement of the Accused Products).

Using the above pictures as a guide, a user of the Accused Products climbs up the rungs of the lower yellow ladder onto the yellow landing, takes two steps forwards onto the red landing, then turns ninety-degrees to the right, and walks forward up the staircase. *See* SoF at ¶¶8-12. When folded, the lower ladder portion folds over the flat intervening landings and makes no contact with the staircase. *See* SoF at ¶¶8-9. When deployed, the lower ladder portion folds out over the surrounding containment berm on a jobsite. Exhibit F, Fred Smith's Non-Infringement Report at ¶62.

There are many differences in the "way" that the Accused Products perform as compared to the constructed claim, necessitating summary judgment of non-infringement. *Kemco*, 208 F.3d at 1365. First, the differences between two staircase portions ('782 Patent) vs. a staircase and ladder (Accused Products) lead to a change in continuity. Exhibit F at ¶39. Second, the intervening platforms change the way the tank functionality in how the suspension and axels are configured. *Id.* at ¶40. Third, the lower portion of the Accused Products (i.e., ladder) has rungs, not steps, necessitating requiring a user to utilize hand rails to ascend. *Id.* at ¶¶41-42, 46. The Accused

Product has no "connection" to allow for folding upon itself, changing the way the folding/unfolding happens. *Id.* at ¶¶43-44.

A fuel containment berm is a walled structure that surrounds a fuel tank to contain fuel in the event of a spill. Exhibit D, Klopp Deposition, 176:11-19; Exhibit G, Deposition of Chris Holifield, at 40:2-13. The Accused Products were specifically designed with a ladder that folded out over the berm, so the ladder itself sits outside the containment berm while the tank is fully contained within the berm. Exhibit G at 40:2-9. This is important in the fuel industry, as the containment berm can fill with liquid that, in the winter, can turn to dangerous ice. Exhibit F at ¶61. The claimed design lacks this capability; the stairs in the '782 Patent do not extend to outside the fuel berm, and thus require a user accessing the stairs to step inside the berm to access the tank. Conversely, the Accused Products were specifically designed to function in this way.

Additionally, the two intervening platforms in the accused products—the yellow platform at the top of the ladder and the red platform at the bottom of the staircase—are landings that sit between the lower yellow ladder of the Accused Devices and the upper yellow staircase of the Accused Devices. This intervening platform changes both the path that the user has to take to traverse from the ground to the top-most "horizontal platform":



*Id.* at ¶57.  In addition to the path difference (as outlined in the above arrows), the intervening platforms of the Accused Product provide an enhanced safety feature that is not present in the patented design.  *Id.* at ¶¶56-57 (listing 5 distinct differences).  The intervening platforms provide a landing in the event a user trips while walking down the staircase portion.  In the claimed design, upon tripping, the user will fall all the way to the ground from a height of the horizontal platform.  In the Accused Product, at most, the user would fall half the distance before reaching a platform or ground.

There is no dispute as to how the Accused Products function; this matter is ripe for summary judgment.  *S. Mississippi Plan. & Dev. Dist., Inc. v. Robertson*, 660 F. Supp. 1057, 1059 (S.D. Miss. 1986) (summary judgment is appropriate when the "underlying facts are undisputed, and the record reveals no evidence from which reasonable persons might draw conflicting inferences about these facts."); *see* Portabull's Statements of Uncontested Facts.  And because the undisputed facts contain no evidence to suggest that Accused Products meet the literal construction of the '782 Patent, either as described in the specification (as Dr. Klopp himself admits) or under

the equivalents prong of the §112 construction (due to the significant differences) and therefore summary judgment is proper. *Celotex*, 477 U.S. at 323.

**B.     The '782 Patent is Unenforceable Due To Mark Beard's Violation Of His Non-Compete Clause**

The Beard family, namely the late Mark. W. Beard's father, Leo Beard had an effective monopoly on the fuel supply business that he passed to his son Mark in the 1990's and 2000's. Exhibit B, Deposition of Mark W. Beard, at 28:18-29:4; *see also* SoF at ¶17. Mark W. Beard, in an effort to cash-out his father's monopoly, sold the then-existing company in 2010 for a substantial sum, when Maxum Petroleum was "willing to pay what [he] wanted for it." *Id*. at 37:11-39:22; Exhibit C, Stock Purchase Agreement at BNJ-000001120; *see also* SoF at ¶18. On December 22, 2010, M&L Petroleum, Inc., Mark W. Beard, and Linda K. Beard (collectively "Sellers"), executed a Stock Purchase Agreement with Simons Petroleum, Inc., a subsidiary of Maxum Petroleum Operating Company ("the Agreement"). *See* SoF at ¶¶18, 20.

Among other things, the Seller (notably, Mr. Beard, the inventor of the '782 Patent) agreed that for seven years after closing, no Seller would, anywhere in the United States, "directly or indirectly own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, representative, or otherwise), consult with, render services for, or ***in any other manner engage in any Restricted Business***." Exhibit C, Stock Purchase Agreement, at BNJ-000001150-1151 (emphasis added); *see also* SoF at ¶¶21-22. Restricted Business was defined in that agreement as "any business (i) engaged in the distribution or sale of fuel or lubricants to any pipeline construction contractor or any other commercial, industrial, or agricultural business or enterprise or (ii) that utilizes Mobile Fueling Systems (including in connection with construction, electrical distribution, timber, or wind farm projects or any similar construction or other projects)

or any other tanks or equipment similar to Mobile Fueling Systems." *Id.* at BNJ-000001118-1119; *see also* SoF at ¶23.

As part of this sale, Mr. Mark W. Beard, the inventor of the '782 Patent, also executed an Employment Agreement that included its own covenant not to compete for a period of 24 months following the termination of employment with Simons and Maxum. *Id.* at BNJ-000001278-1287. This Employment Agreement was extendable beyond 2012, and this additional non-competition clause of the Employment Agreement covered the situation where Mr. Beard continued to work for Maxum for many years. *Id.* No extension ever occurred.

Mr. Beard, entirely aware of this restriction, created a different company, MRB Enterprise and installed his son as the head of the company in an effort to avoid his non-compete clause. Exhibit B at 55:21-56:10, 58:5-17, 60:18-24. In blatant disregard for both the non-competition provisions of Mr. Beard's Employment Agreement (which extended through December 31, 2014) and the non-competition provisions of the Stock Purchase Agreement (which extended through December 22, 2017), Mr. Mark W. Beard filed the application that eventually became the '782 Patent, contacted customers, purchased fuel tanks, and otherwise engaged in Restricted Business prior to December 31, 2014, and well prior to December 22, 2017. Exhibit B at 64:4-65:7 (admitting to purchasing over a dozen tanks between 2013 and 2015) and 72:23-76:9 (admitting the second design, after purchasing over a dozen tanks, was made based on customer feedback); Exhibit A (indicating the filing of the priority document of the '782 Patent in 2015). Notably, had Mr. Beard abided by his non-competition agreements, and waited until 2017 to file the '782 Patent, Portabull's *currently in-use* products (the Accused Products) would constitute prior art to the '782 Patent.

Mr. Beard's pre-litigation business misconduct is entirely attributable to the Plaintiffs, which Mr. Beard treated as the same entity and which the Plaintiffs' now seek to merge together into one amorphous "Beard Oil." Exhibit H, Wacek Deposition, at 26:21-27:4 ("I refer to Beard Oil as a defined term in my report as the BNJ and MRB entities collectively, much like they're described that way in the marketplace."). This industry reputation of the Plaintiffs and Mr. Beard is exactly the type of attribution necessary for the unclean actions of Mr. Beard to transfer to his operating companies, the Plaintiffs. *Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231, 1240 (Fed. Cir. 2018). Indeed, this "wrongful business conduct ha[s] the required connection to this patent litigation" as but-for the breach of the non-compete (which Portabull cannot bring an independent cause of action for), Beard would not have attained the patent that is the focus of this dispute. *Id.* at 1242.

Just like in *Gilead*, the attainment of the patent by the patentee stems directly from the business misconduct, and just like in *Gilead*, recovery by the patentee should be barred. *Id.* There are no disputed facts that need finding related to the equitable defense to patent infringement, and the issue is ripe for determination before this court at the summary judgment phase of this case.

### C.       The 2013 Design Offered For Sale By H&H Welding to Portabull is Prior Art

In June of 2013, Chris Holifield of H&H Welding and Dan Ellzey of Portabull met to discuss a tank design. *See* SoF at ¶13. At this meeting, Mr. Holifield and Mr. Ellzey discussed tank designs, Mr. Holifield shared a number of proposals with Mr. Ellzey, and ultimately, Mr. Ellzey, on behalf of Portabull, elected to purchase one of the presented designs. *See* SoF at ¶¶13-14. There is no competing evidence that suggests this meeting did not occur or that the design was not presented for sale to Portabull.

Nearly 18 months later, on February 24, 2015, the patent to which the '782 Patent claims priority was filed. The AIA version of the Patent Act went into effect in 2013, such that the '782 Patent is squarely within the AIA and all AIA versions of the Patent Act apply. Activities that happened before February 24, 2015 are prior art to the '782 Patent. 35 U.S.C. 102(a) (2013). Particularly germane here, any public uses, offers for sale, or any activities that were otherwise available to the public are also prior art to the '782 Patent. *Id.*

Because the facts are uncontroverted, Portabull herein seeks summary judgment that, as a matter of law, the commercial activities that occurred in June of 2013 between Portabull and Mr. Holifield constitute prior art to the '782 Patent. Mr. Holifield and Mr. Ellzey both testified that the meetings to discuss a fuel tank design happened in 2013. Exhibit G, Holifield Deposition, at 43:4-14, 33:7-37:25; 41:3-42:4, 186:24-187:10; Exhibit I, Ellzey Deposition, at 53:25-54:3, 105:25-106:15, 128:11-129:9; *see also* Exhibit J, Exhibit 2 to Holifield deposition *See* SoF at ¶¶13-14. There is no evidence in the record that the meetings did not occur in June of 2013, so there is no reason to doubt these witnesses' shared recollection.

Moreover, the drawings presented at these meetings both corroborate the date of the meetings and also establish the "product" offered for sale was "ready for patenting." *Helsinn*, 139 S. Ct. at 633 (a devices is "ready for patenting" if the "drawings or other descriptions of the invention [are] sufficiently specific to enable a person skilled in the art to practice the invention."); Exhibit J. Mr. Holifield confirmed that the device that was offered for sale could have been delivered to Portabull within two weeks had Portabull elected to agree to the then-offered financial terms. Exhibit G, Holifield Deposition, at 41:3-42:4*; see also* SoF at ¶16; *Group One*, 254 F.3d at 1048 ("[A] commercial offer for sale [under § 102(b) is] one which the other party could make into a binding contract by simple acceptance (assuming consideration)."). However, Portabull

declined to actually purchase the tank because it was too expensive, and Portabull's business at the time did not support it. Exhibit I, Ellzey Deposition, at 106:13-15; Exhibit G, Holifield Deposition, at 41:23-42:4; *see also* SoF at ¶15. Both Mr. Holifield and Mr. Ellzey recall the decision being made to go with the less expensive option, confirming a price was discussed, the price was simply too high for Portabull. *Id.; see also* SoF at ¶15. This lack of actual purchase of the 2013 design does not alter the prior art status of the offer for sale, as it was still an offer that could have been made binding upon acceptance. *Group One*, 254 F.3d at 1048; *see also* Exhibit G, Holifield Deposition, at 191:16-23.

Though Mr. Holifield may treat certain ***documents*** as confidential, practices surrounding those documents does not change the fact that H&H Welding readily shares its ***designs*** with those who want to know, and routinely gets new business by this very practice. *Id.* at 88:25-89:25. The design that was offered for sale is indeed prior art as it was the subject of a commercial offer for sale and it was ready for patenting in 2013. It is this ***design*** not any specific document, that Portabull seeks a legal determination as to the prior art status.

Notably, there are many cases directed towards a third-party's use of a patented method not being a prior art instance. *See e.g.*, *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983), *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516 (2d Cir.1946). The case at hand has nothing to do with a secret process; the '782 Patent is an apparatus patent, claiming a physical tank. *In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002) ("A process, however, is a different kind of invention; it consists of acts, rather than a tangible item."). Mr. Holifield plainly offered an apparatus having a specific design for sale in June of 2013, and that offer constitutes prior art under the AIA.

In the event that the Court is not persuaded that the presentation and discussion does not qualify the presented design as "on sale" under the patent statute, the presented design is prior art under the "or otherwise available to the public" prong of 35 U.S.C. 102-AIA that congress added to provide a broader swath of material that constitutes prior art. In addition to the disclosures made regarding the offer for sale addressed above, Mr. Holifield further explained in deposition that anyone who wanted a tour of the shop or to see what was happening in the store could access the shop; notably, this exact practice has led to sales for H&H. Exhibit G, Holifield Deposition, 88:25-89:25. There is no competing evidence to this point. As set forth in *BASF* "[w]hen no efforts are made to conceal a process or design, it is available to the public." 955 F.3d at 966. There need not be an advertisement of a product to make it available, as long as no active efforts were undertaken to conceal a design, it may be considered "available to the public." *Id.* Under either the "on sale" or "otherwise available to the public" prongs of 35 U.S.C. § 102, the 2013 disclosure is prior art.

### D.  Dr. Wacek's Opinions On Lost Profits Should Be Stricken

*Panduit* articulates a four-factor test that has since been accepted as a useful, but non-exclusive, way for a patentee to prove entitlement to lost profits damages. Under *Panduit*, a patent owner **must** prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made. *Panduit*, 575 F.2d at 1156. Establishing the existence of acceptable non-infringing substitutes or alternatives tends to prove that the patentee would not have lost the sales to a non-infringing third party rather than to the infringer. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F. 3d 1538, 1548 (Fed. Cir. 1995). If a plaintiff cannot establish Panduit factor two, there can be no award of lost profits. *Id.*

Dr. Wacek's lost profits opinions are based on an analysis of the *Panduit* factors.  Exhibit H, Wacek Deposition, at 84:8-85:8.  While there may be other ways to arrive at a lost profits theory, Dr. Wacek did <u>not</u> undertake those analyses.  *Id.* at 87:13-88:10 ("I didn't analyze damages in this case using those approaches. It didn't fit the facts of this case").

Dr. Wacek's lost profits opinions are predicated on an understanding that there are no available, acceptable non-infringing alternatives.  *Id.* at 83:6-84:2.  Dr. Wacek states that he is "not aware of any available acceptable alternatives to the patented technologies" and relies on Dr. Klopp for this technical opinion (an opinion that he, as a damages expert, is unqualified to make on his own).  Exhibit K, Report of Dr. Wacek, at 12-13.

the company ultimately did not implement because PortaBull had a "very tight budget."[57] This is consistent with my understanding from Dr. Klopp regarding the lack of commercially available, acceptable alternatives that provide the same benefits of the patented technologies to both users and PortaBull.

*Id.* at 13.

Dr. Wacek purportedly relied on Dr. Klopp for the technical analysis of any non-infringing alternatives.  Exhibit H, Wacek Deposition, at 64:16-65:5, *see also* 75:18-22 ("Well, I absolutely am relying on my understanding from Dr. Klopp regarding technical aspects of potential alternatives and whether those would be available and acceptable"), 76:19-77:25 ("I am – on technical issues, I'm relying on Dr. Klopp").  Dr. Klopp offers no such opinion.  Both of Dr. Klopp's reports lack any mention of any analysis of non-infringing alternatives.  *See generally* Exhibit E, Klopp Report On Infringement; Exhibit L, Klopp Report On Validity.  Even more egregious, Dr. Klopp confirmed during deposition that he offers no such opinions:  "Q: Dr. Klopp, can you direct me in either Exhibit 2 or Exhibit 3 to any of your opinions about noninfringing alternatives? ... A: Right.  Not – not in those reports…."  Exhibit D, Deposition of Dr. Klopp, at 69:12-21.  There is simply no technical analysis in the record for Dr. Wacek to rely upon for his conclusion that there are no available, acceptable non-infringing alternatives.

Dr. Wacek relies on evidence that is simply not part of the record and therefore his analysis is not based on sound legal principles. Exhibit D, Klopp Deposition, at 69:12-21. Dr. Wacek also did not have any conversations with any customers regarding non-infringing alternatives (or anything else). Exhibit H, Wacek Deposition, at 106:3-12.

In the absence of such testimony, Dr. Wacek has no factual support for his assertion that there are no available non-infringing alternatives. To allow Dr. Wacek to offer an opinion regarding lost profits without any factual underpinnings would be improper. *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) ("this court requires **sound economic proof** of the nature of the market and likely outcomes with infringement factored out of the economic picture"). This is an error that cannot be remedied with cross examination. Permitting Dr. Wacek to proceed with his lost profits will undoubtedly "artificially inflate the jury's damages calculation beyond that which is 'adequate to compensate for infringement.'" *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012) (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011)). Dr. Wacek's lost profits opinions should be excluded.

### E.  Dr. Klopp's Doctrine Of Equivalents Theory Should Be Stricken As Undisclosed

Addendum A of the Case Management Order (Dkt. No. 18-1) requires that the Plaintiffs must "specify whether the alleged infringement is literal or falls under the doctrine of equivalents" and even gives the Plaintiffs the opportunity to amend such identification. Dkt. No. 18-1 at 2 ("Plaintiffs' Preliminary Disclosures"); *see also* 4 ("After the Claim Construction Hearing" Plaintiffs may amend their preliminary infringement disclosures).

Plaintiffs' infringement contentions contain no mention of a theory based on the doctrine of equivalents. Exhibit M, Plaintiffs' Amended Infringement Contentions, 2-4. Specifically, in the third column, where Plaintiffs identify the basis for infringement for each element, they contend the infringement is "Literal." *Id.* In footnote two, Plaintiffs again confirm that "Plaintiffs assert this limitation [the "deck access device," as construed by the Court] is **literally** infringed." *Id.* at 3 (emphasis added). Dr. Klopp goes beyond these contentions by offering an infringement theory based on the doctrine of equivalents. Exhibit E, Klopp Infringement Report, at ¶89 ("it is my opinion that the Accused Products includes the limitations of Claim 1(d.ii) under the doctrine of equivalents"). Dr. Klopp confirmed during deposition that his report includes an infringement theory based on the doctrine of equivalents. Exhibit D, Klopp Deposition, at 117:9-24.

A party's expert report may not introduce a theory not previously set forth in the infringement contentions. *ROY-G-BIV Corp. v. ABB, Ltd.*, 63 F. Supp. 3d 690, 699 (E.D. Tex. 2014); *Anascape, Ltd. v. Microsoft Corp.*, No. 9:060cv0158, 2008 WL 7180756, *4 (E.D.Tex. May 1, 2008) (striking portions of expert report that exceeded scope of contentions).

Dr. Klopp's opinions as it relates to the doctrine of equivalents, in addition to being far beyond the scope of Plaintiffs' infringement contentions, fail as a matter of law. Part of the reason that the lack of disclosure of the doctrine of equivalents theory is so egregious is that Portabull was unaware of this theory and was unable to prepare its defenses to the theory.

A properly articulated doctrine of equivalents theory permits the defendant to raise a defense of ensnarement. In this regard, "[a] doctrine of equivalents theory cannot be asserted if it will encompass or 'ensnare' the prior art." *G. David Jang, M.D. v. Bos. Sci. Corp.*, 872 F.3d 1275, 1285 (Fed. Cir. 2017). "A patentee, like [Plaintiffs], bears the burden of proving that it is entitled to 'the range of equivalents which it seeks.'" *Id.* at 1287. "[W]hen utilizing the hypothetical claim

tool, that burden starts with proposing a proper hypothetical claim that only broadens the issued asserted claims." *Id.* Plaintiffs' failure to articulate this theory is underscored by its failure to articulate a hypothetical claim. Exhibit D, Klopp Deposition, at 117:21-118:2 (confirming that Dr. Klopp did not present any hypothetical claim analysis). Accordingly, Portabull has been unable to raise any defense to this undisclosed doctrine of equivalents theory, or to undertake any discovery relating to this undisclosed hypothetical claim.

Plaintiffs' utter failure to disclose its doctrine of equivalents theory mandates the striking of Dr. Klopp's opinions as it relates to the undisclosed doctrine of equivalents theory. *Teashot LLC v. Green Mountain Coffee Roasters, Inc.*, 595 F. App'x 983, 987 (Fed. Cir. 2015) (confirming the propriety of striking an experts opinions when the plaintiff failed to disclose what infringement theories it was pursuing).

**F.** **Dr. Klopp's Opinions On Validity Should Be Stricken**

When an expert's opinions are based on improper understanding of the law, those opinions are unreliable and the expert should be precluded from testifying regarding his or her incorrect understanding of the law. *Hebert*, 99 F.3d at 1117.

Dr. Klopp repeatedly offers the opinion that Portabull's expert, Mr. Smith, is incorrect because Mr. Smith does not provide an explanation about how "to combine the two devices into something that could be road-legal." *See e.g.* Exhibit L, Rebuttal Report of Dr. Klopp, at ¶¶91-96, 113-118, 143-147, 191-196; *see also* Exhibit D, Klopp Deposition, at 165:3-166:12. These opinions all suggest that Mr. Smith needed to provide some sort of blueprint or other actual design work to underscore his opinions. For example, Dr. Klopp super-imposes two images and argues that the "relative size" of the two somehow precludes the combination of the technical teachings of the two components:



Figure 15: The 2013 Portabull Tank (top left) as compared to Benko (top right). By scaling the size of Benko based on the size of the person, a visual estimate of the relative size differences of Benko and the 2013 Portabull Tank can be achieved (bottom).

Exhibit L, Rebuttal Report of Dr. Klopp, at ¶196.

Dr. Klopp's opinions at these paragraphs are legally erroneous and should be stricken. The test for obviousness, the invalidity theories advanced by Mr. Smith, is not whether the teachings of two references can be cut-and-pasted together, but rather what the teachings suggest to one of ordinary skill in the art. *Facebook*, 973 F.3d at 1343; *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc) (allegations that teachings of one reference cannot be incorporated into another "are basically irrelevant" because the test is "not whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole.").

It is this Court's duty as gatekeeper to ensure that experts do not present testimony based on an improper understanding of the law in order to avoid jury confusion. *See e.g.*, *Innovention Toys*, 2012 WL 12990384, at *4; *Accord Bausch*, 79 F. Supp. 2d 252, 257-58 (W.D.N.Y. 2000).

## IV.    CONCLUSION

Portabull respectfully requests a finding of non-infringement as a matter of law as the Accused Products do not include the claimed "deck access device."  In the event the Court is not persuaded, Portabull requests a finding of unenforceability of the '782 Patent in view of Mr. Beard's violation of his non-compete.  If the Court is unpersuaded of either of these two requests, Portabull respectfully requests a finding that the 2013 Offer for Sale by H&H to Portabull is prior art.  Additionally, Portabull submits that Dr. Klopp's opinions related to lost profits should be excluded and Dr. Klopp be precluded from offering any opinion as to a lost profits based damages recovery.  Finally, Portabull requests that Dr. Klopp's infringement theory based on the doctrine of equivalents, paragraphs  89 (and any other mention of the doctrine of equivalents), be excluded along with Dr. Klopp's rebuttal opinions as it relates to validity, paragraphs 91-96, 113-118, 143-147, 191-196, be similarly excluded as undisclosed and contrary to the law respectively.

Dated:  October 15, 2021

Respectfully submitted,

s/ Benjamin E. Weed
Benjamin E. Weed *(pro hac vice)*
Erik J. Halverson (*pro hac vice*)
K&L Gates LLP
70 W. Madison St.
Suite 3300
Chicago, IL 60602
Phone: 312-372-1121
benjamin.weed@klgates.com
erik.halverson@klgates.com

Patrick H. Zachary (MSB #6674)
Vicki R. Leggett (MSB #1187)
Zachary & Leggett, PLLC
211 S. 29th Avenue, Suite 100
P.O. Box 15848
Hattiesburg, MS 39402
Telephone: (601) 264-0300
Facsimile: (601) 264-0311
Pat@zandllaw.com
vleggett@zandllaw.com

*Attorneys for Defendant*
 *Portabull Fuel Service, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 15, 2021, I electronically transmitted the foregoing to the Clerk of the Court using the CM/ECF system for filing and transmittal to the CM/ECF registrants.

s/ Benjamin E. Weed
Benjamin E. Weed